FILED

JEFFREY S. KERR
(VA Bar Number 42122)
JeffK@Petaf.org
PETA Foundation
1536 16th Street, NW
Washington, DC 20036
Telephone:    (202) 540-2171
Facsimile:    (202) 540-2208

2015 MAY -8  P 12: 19

CLE⎯⎯ ⎯⎯⎯ ⎯⎯⎯ ⎯⎯
⎯⎯⎯ ⎯⎯⎯ ⎯⎯⎯

Attorney for Plaintiff
PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE and SALLY JEWELL, in her official capacity as Secretary of the Interior,<br><br>Defendants. | Case No.  1 : 15 CV 600 CmH / IDD<br><br>**Complaint for Declaratory and Injunctive Relief** |

1.    Plaintiff, People for the Ethical Treatment of Animals, Inc. ("PETA"), brings this action against Defendants, United States Fish and Wildlife Service ("FWS") and Sally Jewel, in her official capacity as Secretary of the Interior (the "Secretary"), for violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the FWS regulations, 50 C.F.R. Ch. 1, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706. Defendants are violating these laws by regularly issuing permits authorizing applicants to engage in activities that are prohibited by the ESA without requiring permit applicants to demonstrate that the activities for which they are seeking the permits will enhance the species' propagation or survival, as required by the ESA. Instead, Defendants have instituted an unlawful Pay-to-Play

policy, which allows permit applicants to make a collateral donation of as little as $500 to a conservation organization in lieu of demonstrating that their proposed activities will actually enhance the propagation or survival of the species, as the ESA and FWS regulations mandate.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 5 U.S.C. § 706(1) and 28 U.S.C. § 1331.

3.      Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred there.

## PARTIES

**A.      Plaintiff**

4.      PETA is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code.

**B.      Defendants**

5.      Defendant FWS is a federal agency within the Department of the Interior. The Interior Department is charged with implementing the ESA with respect to land animals. The Branch of Permits in the FWS's Division of Management Authority, which issued the permits at issue in this case, is located at 4401 N. Fairfax Drive, Arlington, VA 22203.

6.      Defendant Sally Jewel is sued in her official capacity as Secretary of the Interior. The Secretary is the federal official responsible for protecting threatened and endangered species under the ESA.

## STATUTORY AND REGULATORY FRAMEWORK

7.      The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Babbitt v. Sweet Water Home Chapter of Cmtys. for a Greater Or., 515 U.S. 687, 698 (1995). The Act "encompasses a vast range of economic . . . enterprises and endeavors." Id. at 708. "[L]iterally every section of the statute" reflects the "plain intent of Congress . . . to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978).

Complaint for Declaratory and Injunctive Relief

8.      Section 9 of the ESA, 16 U.S.C. § 1538, prohibits taking endangered species; possessing, selling, delivering, carrying, transporting, or shipping any illegally taken endangered species; importing or exporting endangered species; delivering, receiving, carrying, transporting or shipping endangered species in the course of a commercial activity; and selling or offering an endangered species for sale. Id. § 1538(a)(1).

9.      Section 10 of the ESA, 16 U.S.C. § 1539, allows for exceptions to Section 9's prohibitions in strictly limited circumstances. It allows Defendants to issue permits for most activities prohibited by Section 9 only "for scientific purposes or to enhance the propagation or survival of the affected species." Id. § 1539(a)(1)(A). Section 10 permits issued "to enhance the propagation or survival of the affected species" are referred to as "enhancement permits."

10.      The safeguards in § 10 were intended "to limit substantially the number of exemptions that may be granted under the Act, . . . given that these exemptions apply to species which are in danger of extinction." H.R. Rep. No. 93-412, at 17 (1973) (emphases added). Such was Congress's desire to limit exemptions that it prohibited "[v]irtually all dealings with endangered species, . . . except in extremely narrow circumstances." Tenn. Valley Auth., 437 U.S. at 180 (emphasis added).

11.      Similar to 16 U.S.C. § 1539(a)(1)(A), 50 C.F.R. § 17.21(b) makes it "unlawful to import or to export any endangered wildlife."

12.      50 C.F.R. § 17.22 creates a narrow exception to this prohibition, allowing "[t]he Director [to] issue a permit authorizing activity otherwise prohibited by § 17.21 . . . for enhancing the propagation or survival . . . of endangered wildlife" (together with 16 U.S.C. § 10(a)(1)(A), the "Enhancement Requirement").

13.      50 C.F.R. § 17.3 defines "Enhance the propagation or survival, when used in reference to wildlife in captivity" as "includ[ing] but . . . not [being] limited to the following activities when it can be shown that such activities would not be detrimental to the survival of wild or captive populations of the affected species:

          (a)      Provision of health care, management of populations by culling, contraception, euthanasia, grouping or handling of wildlife to control survivorship and

Complaint for Declaratory and Injunctive Relief

reproduction, and similar normal practices of animal husbandry needed to maintain captive populations that are self-sustaining and that possess as much genetic vitality as possible;

(b)  Accumulation and holding of living wildlife that is not immediately needed or suitable for propagative or scientific purposes, and the transfer of such wildlife between persons in order to relieve crowding or other problems hindering the propagation or survival of the captive population at the location from which the wildlife would be removed; and

(c)  Exhibition of living wildlife in a manner designed to educate the public about the ecological role and conservation needs of the affected species."

14.  On the faces of 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22, and consistent with the purposes of the ESA, an applicant only qualifies for an exemption under the Enhancement Requirement to engage in otherwise prohibited activities if it demonstrates that the otherwise prohibited activities—e.g., exporting and importing endangered animals—will likely enhance the propagation or survival of the species. The conservation benefit must directly stem from the proposed use of the endangered animals. Wholly collateral activities not otherwise prohibited by § 9 that enhance the species' survival—such as giving money to unrelated conservation efforts—are legally irrelevant.

15.  Senator John Tunney of California, who proposed the Enhancement Requirement, stated that the requirement "would permit otherwise prohibited acts when they are undertaken to enhance the propagation or survival of the affected species." Cong. Research Serv., 97th Cong., Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, and 1980, at 358 (Comm. Print 1982) (emphases added). He explained that "[t]his is a needed management tool recommended by all wildlife biologists, . . . for example, where a species is destroying its habitat or where the species is diseased." Id. at 396.

16.  As far back as 1979, the agency explained that "permission may be granted for [otherwise prohibited] activities if they are conducted for certain purposes. In the case of endangered wildlife, the Act limits them to scientific purposes or to purposes of enhancing the propagation or survival of the affected species." Captive Wildlife Regulation, 44 Fed. Reg. 54002, 54005 (Sept. 17, 1979) (emphasis added); see also id. ("Only those activities conducted

Complaint for Declaratory and Injunctive Relief

to enhance propagation or survival of the affected species may be authorized by the present rule." (emphasis added)).

17.     Defendants issue two types of ESA permits for export and import: (1) one-year import/export permits, which authorize the export or import of one or more animals to or from a single, specified country, and (2) traveling exhibition certificates, which authorize the export and re-import of a single animal to and from any other country or countries during a three-year period.

18.     The APA provides, in relevant part, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be": "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIM

### A.     The Pay-to-Play Policy

19.     Rather than requiring applicants for enhancement permits to demonstrate that the activities for which they seek the permits will "enhance the propagation or survival of the affected species," 16 U.S.C. § 1539(a)(1)(A), as the Enhancement Requirement mandates, Defendants routinely issue such permits for commercial activities in exchange for *de minimis* donations to unrelated conservation projects (the "Pay-to-Play policy"). One permit applicant called the Pay-to-Play policy the "old Chicago system."

20.     Prior to 2011, Defendants routinely issued enhancement permits to applicants who claimed that the public display of endangered animals enhances the survival of the species by heightening the public's commitment to conservation. This policy of issuing enhancement permits on the basis of so-called conservation education flew in the face of the near scientific consensus that using endangered species in exhibitions and entertainment has no impact on public attitudes about conservation. Defendants themselves voiced concern that "captive-bred animals   . . . might be used for purposes that do not contribute to conservation, such as . . . for entertainment," 57 Fed. Reg. 548-01 (Jan. 7, 1993), and acknowledged their "sincere doubts

about the relative conservation benefits that are provided to non-native species in the wild from the public exhibition of living wildlife," 58 Fed. Reg. 68323 (Dec. 27, 1993).

21. In or around 2011, Defendants began advising applicants for enhancement permits that conservation education alone no longer suffices to meet the Enhancement Requirement. Instead, Defendants' new policy requires applicants to "demonstrate how [their] proposed activities directly relate[] to the survival of th[e] species in the **wild**."

22. As part of this new policy, Defendants implemented the Pay-to-Play policy. The Pay-to-Play policy purports to allow permit applicants to "demonstrate" that "[their] proposed activities directly relate[] to the survival of th[e] species in the wild" merely by making a *de minimis* donation to collateral species conservation.

23. Defendants advised an applicant that sought a permit to ship endangered tigers abroad to perform tricks in a circus that it could now meet the Enhancement Requirement by "donating to a well-established conservation program in the range state." In separate correspondence to the same applicant, Defendants offered "[c]ontribut[ing] money to an organization that participates in in-situ work in the range state for [the protected species]" as "[a]n [e]xample of an activity applicants participate in to show enhancement."

24. Defendants advised another applicant, which sought a permit to take endangered tigers overseas to perform "amazing feats of magic with gorgeous dancers" in "[a] lavish Las Vegas style stage show," that it could meet the Enhancement Requirement by "[p]articipat[ing] [in] in situ conservation work in the species **range states**," for example, by "[d]onat[ing] money to organizations working to help protect [the protected species]"; "[m]ak[ing] contribution towards anti-poaching costs or compensation of livestock kill"; or "[m]ak[ing] contribution towards fuel and field expenditures, salaries, [and] camera-trap surveys."

25. Defendants later informed another circus that "[m]any of our applicants achieve th[e] goal" of "demonstrat[ing] how [their] proposed activities directly relate to the survival of th[e] species in the wild" "by donating to a well-established conservation program in the range state."

Complaint for Declaratory and Injunctive Relief

26.     In 2014, Defendants told yet another applicant, which sought a permit to take endangered elephants on tour with the circus in Canada, that "[u]ndertaking activities that will benefit the survival of [the protected species] in the wild could be achieved through . . . contributing money to . . . activities such as: [c]onserving habitat critical to the preservation of the species;" "[t]he employment of communities to protect and monitor the species;" or "[p]urchasing equipment needed by workers in the field."

27.     In correspondence with a multimillion-dollar circus which frequently applies for enhancement permits to ship endangered elephants and big cats abroad to stand on their heads and dance in a conga line for audiences, Defendants explained that "[e]very time an application is submitted either more contributions should be submitted to" "the projects you are investing in so far" "or other contributions [must be] submitted to a new project."

**B.      Knowlton and Luzich**

28.     In 2013 and 2014, the Dallas Safari Club auctioned off two special hunting permits issued by the Government of the Republic of Namibia to hunt endangered black rhinos in Namibia. There are only about 5,000 black rhinos left on earth today. Since 1981, the species has disappeared from at least ten countries, and three subspecies were declared extinct in 2011.

29.     Michael Luzich placed the winning bid for the permit in 2013, while Corey Knowlton won the permit in 2014. On January 25, 2014, and April 4, 2014, respectively, Knowlton and Luzich applied for permits to import their sport-hunted trophies into the United States "for the purpose of enhancement of the survival of the species."

30.     The applicants based their applications entirely on the ground that the revenue generated from sport-hunting black rhinos would "provid[e] essential budget revenue for rhino conservation authorities and leaders in Africa." The applicants never argued that the act of importing the trophies itself would enhance the propagation or survival of the species, even though that was the prohibited activity for which they sought an exemption. Comedian Stephen Colbert mocked this rationale on *The Colbert Report*, joking, "It's like the old saying, if you love something, set it free. Then, when it has a bit of a head start, open fire."

31.     Plaintiff submitted comments to Defendants opposing Knowlton's and Luzich's applications on a variety of grounds, including on the ground that the Pay-to-Play policy violates the ESA and Defendants' own regulations.

32.     Nevertheless, Defendants approved the applications and issued Knowlton and Luzich the permits in April 2015.

33.     Pursuant to the Pay-to-Play policy, Defendants issued the enhancement permits to Knowlton and Luzich, in whole or in necessary part, on the basis of the money paid by the applicants to hunt the critically endangered black rhinos.

C.     **Tarzan Zerbini Circus**

34.     On November 13, 2013, the Tarzan Zerbini Circus ("Zerbini") applied for traveling exhibition certificates to export and re-import two endangered Asian elephants "for the purposes of enhancement of the species." Zerbini planned to transport the elephants to Canada to perform stunts in its for-profit touring circus.

35.     The U.S. Department of Agriculture ("USDA") has cited Zerbini and the Two Tails Ranch, where Zerbini often holds animals it owns and uses, for approximately two-dozen violations of the federal Animal Welfare Act ("AWA"), including failing to provide an elephant with sufficient space, exposing elephants to the risk of electrocution, failing to properly treat an elephant with tuberculosis, allowing elephants access to areas where waste was piled feet high, and feeding elephants an unhealthy diet. The USDA also assessed Zerbini a civil penalty for importing tuberculosis samples obtained from elephants touring in Canada into the United States without required USDA permits. Furthermore, three elephants traveling with Zerbini, who had been giving rides to children, were kicked out of Canada after the USDA alerted Canadian authorities that the elephants had been in prolonged contact with a tuberculosis-positive elephant.

36.     Zerbini justified its application for enhancement permits on the basis of (1) its purported conservation-education activities—which does not suffice to meet the Enhancement Requirement—and (2) a single $500 donation it made to Asian Elephant Support, a small non-profit organization with four board members and no employees, which primarily focuses on the needs of captive, rather than wild, elephants.

Complaint for Declaratory and Injunctive Relief

37.     On information and belief, Zerbini's $500 donation represents just 5/10,000ths of the circus's annual revenues.

38.     Zerbini provided no evidence to Defendants that it had ever donated money to conservation efforts before submitting the applications on November 13, 2013.

39.     Plaintiff submitted comments to Defendants opposing Zerbini's application on a variety of grounds, including on the ground that the Pay-to-Play policy violates the ESA and Defendants' own regulations.

40.     Nevertheless, Defendants approved the applications and issued Zerbini the requested traveling exhibition certificates on June 19, 2014.

41.     Pursuant to the Pay-to-Play policy, Defendants issued the enhancement permits to Zerbini, in whole or in necessary part, on the basis of the circus's paltry $500 donation to an unrelated elephant-conservation effort.

**D.     Hawthorn Corp.**

42.     On May 6, 2010, the Hawthorn Corp. ("Hawthorn") submitted applications for traveling exhibition certificates to export and re-import seven endangered tigers "for the purpose of enhancement of the survival of the species." Hawthorn later applied for traveling exhibition certificates to export and re-import additional endangered tigers. Hawthorn planned to export the tigers overseas to perform stunts in a for-profit touring circus.

43.     Hawthorn is notorious for abusing and neglecting endangered animals. The USDA has cited it over 100 times for violating the AWA. In fact, Hawthorn was the subject of the USDA's first ever elephant confiscation: The USDA seized an elephant named Delhi from Hawthorn and ordered Hawthorn to relinquish sixteen additional elephants after finding Delhi in imminent danger because of untreated chemical burns she sustained after Hawthorn forced her to stand in undiluted formaldehyde. The USDA also took a number of additional enforcement actions against Hawthorn—resulting in license suspensions and more than a quarter-of-a-million dollars in civil penalties.

44.     Hawthorn justified its applications for the enhancement permits on the basis of its purported conservation-education activities. It was only after Defendants advised Hawthorn that

Complaint for Declaratory and Injunctive Relief

conservation education does not suffice to satisfy the Enhancement Requirement that the company made a donation to an unrelated conservation organization.

45.     After learning that conservation education alone is insufficient to meet the Enhancement Requirement, Hawthorn partnered with a lobbyist, Steven P. Kendall, to push through its applications. Kendall wrote to Defendants to inform them that Hawthorn "has authorized me to work with Project Tiger in India to benefit tigers in the wild" and that his "proposed activities would include working ... to improve the capacity of protected areas." Hawthorn never adequately explained how a lobbyist whose only experience with endangered species amounted to "spending time" with two European circuses two decades before; who had no scientific training of any kind and no training specifically related to tigers; and who, by his own admission, previously worked as an "undercover operative within ... animal activists groups," with the mission of "protecting the interests of one of the largest entertainment giants in the world, Ringling Brothers and Barnum and Bailey Circus," was qualified to perform in situ conservation work "to improve the capacity of protected areas" in India.

46.     According to its applications for the enhancement permits, Hawthorn would be donating $50,000 to Project Tiger over three years, but this total included the salary, costs, and expenses of Hawthorn's lobbyist.

47.     Plaintiff submitted comments to Defendants opposing Hawthorn's applications on a variety of grounds, including on the ground that the Pay-to-Play policy violates the ESA and Defendants' own regulations.

48.     The Chief of the Division of Management Authority at the FWS told staff that "[the application]'s weak, but I say we accept it and let's get the permits out." On May 9, 2013, Defendants approved the applications and issued Hawthorn the requested traveling exhibition certificates.

49.     Pursuant to the Pay-to-Play policy, Defendants issued the enhancement permits to Hawthorn, in whole or in necessary part, on the basis of the circus's so-called "donation" to an unrelated tiger-conservation organization.

## STANDING ALLEGATIONS

50.     PETA is dedicated to protecting animals from abuse, neglect, and cruelty.  A central tenet of PETA's mission is to expose the abuse and neglect of animals trained,

transported, and used for entertainment; to educate the public about such cruelty; and to encourage people to choose alternative forms of entertainment. To achieve this objective, PETA uses public education, cruelty investigation, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals. PETA focuses these efforts on U.S.-based animal exhibitors and other entertainment, and the vast majority of all of PETA's work takes place in the United States.

### A.    Frustration of PETA's Mission

51.    By unlawfully issuing permits to import and export endangered species, in whole or in necessary part, on the basis of their unlawful Pay-to-Play policy, Defendants' conduct directly frustrates PETA's mission to eliminate the use and abuse of animals for entertainment.

52.    Unlawfully issuing such permits allows U.S.-based animal exhibitors to increase their audiences by taking their shows overseas. For example, according to media reports, "the idea behind [one major exhibitor]'s international push is not to replace existing markets," but rather to take advantage of new untapped markets. Its CEO explained the impetus to take the circus international as his realization that "[t]here are more people outside the U.S. than inside the U.S, and I'm not getting it." On information and belief, other exhibitors are pursuing similar strategies.

53.    This frustrates PETA's mission by increasing the number of people who are exposed to the use of animals in entertainment. As PETA educates the public in the U.S. about the abuse of animals in entertainment, and takes other legal, legislative, and policy steps to eliminate the use and abuse of animals in domestic entertainment, Defendants are enabling exhibitors to open a new international market for these animals' use and abuse.

54.    The international market would be smaller if Defendants did not issue enhancement permits to animal exhibitors. For example, the only elephants used in circuses in Canada are those on tour from the United States. Permitting delays recently caused one circus not to include elephants and tigers in parts of its Canadian tour. Likewise, another did not take any elephants on tour to Canada when it failed to obtain enhancement permits in time.

Complaint for Declaratory and Injunctive Relief

55.      Animal exhibitors must obtain ESA permits to lawfully import and re-export the vast majority of endangered animals they use. The only alternative to meeting the Enhancement Requirement would be establishing that exporting and re-importing the animals for overseas performances was "for scientific purposes"—which these animal exhibitors almost certainly could not do. Nor is it likely that most exhibitors would simply exchange non-endangered animals, who do not require ESA permits, for endangered animals because: (1) many exhibitors have already spent years training the endangered animals; (2) endangered animals, like tigers and elephants, are a bigger draw for audiences than less exotic, non-endangered animals; and (3) on information and belief, endangered animals are a significant aspect of many exhibitors' financial success.

56.      Unlawfully issuing permits also appears to give the U.S. government's imprimatur to the licensed animal exhibitors, suggesting to the public that these exhibitors—and, more generally, similar entertainers—cannot be abusing, neglecting, or mistreating animals. This frustrates PETA's mission by making it harder to persuade the public that it should not tolerate the use of animals in entertainment, and perceptibly impairs PETA's ability to educate the public.

57.      Unlawfully issuing such permits to trophy hunters to import their trophies into the United States further frustrates PETA's mission by encouraging U.S.-based hunters to kill endangered species for sport in countries like Namibia. These hunters would be far less likely to hunt endangered species if Defendants complied with the ESA and prevented them from bringing their trophies back to the United States. Indeed, Knowlton's and Luzich's applications both warn that hunters will be less likely to pay to participate in so-called "conservation hunting" if Defendants do not authorize hunters to import their trophies.

58.      Unlawfully issuing enhancement permits to animal exhibitors, based on the Pay-to-Play policy, also sends the public the message that using endangered species to perform unnatural tricks in circuses, magic shows, and the like—or hunting them for sport—furthers conservation. The public is unaware that, in issuing the permits, Defendants have considered only the applicants' donations; they have not made a substantiated finding that exporting the

animals for use in entertainment—or that importing sport-hunted trophies—itself enhances the survival of the species.   Again, this frustrates PETA's mission of ending the use of animals for entertainment by suggesting that the use of animals for entertainment actually benefits the animals, and perceptibly impairs PETA's ability to educate the public.

**B.     Diversion of PETA's Resources**

59.     Defendants' unlawful issuance of enhancement permits requires PETA to divert resources to traveling internationally to monitor and document U.S.-based exhibitors' mistreatment of the animals they use and to publicizing that mistreatment to additional audiences abroad through various outreach measures, including demonstrations, press releases, letters to venues, and letters to the editor.   Diverting these resources is necessary to counteract the dilution of the impact of PETA's campaigns as a result of Defendants enabling exhibitors to extend their markets overseas.

60.     If PETA prevails in this action, animal exhibitors will be prevented from legally exporting and re-importing the vast majority of the endangered animals they use.   PETA will no longer have to divert resources to monitoring the endangered animals when licensed exhibitors take them abroad and educating the public abroad about the unlawful and inhumane conditions in which these animals are often kept and used.   Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

61.     Defendants' unlawful issuance of enhancement permits also requires PETA to divert resources to additional public-education efforts in the U.S. to counteract the appearance that the U.S. government has given its imprimatur to entertainers, like many circuses and magic acts, such that these exhibitors cannot be abusing or neglecting the animals they use.

62.     If PETA prevails in this action, Defendants will no longer issue enhancement permits on the basis of the Pay-to-Play policy; the public will not receive the message that animals exhibitors cannot be abusing or neglecting the animals they use; and, consequently, PETA will not have to divert resources to counter this message to prevent it from diluting the effectiveness of PETA's ongoing efforts to eliminate the use and abuse of animals in circuses

and other entertainment. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

63.　　Defendants' unlawful issuance of enhancement permits further requires PETA to divert resources to additional public-education efforts in the U.S. to counteract the message that exporting endangered species for use in entertainment actually benefits the animals by aiding conservation.

64.　　If PETA prevails in this action, Defendants will no longer issue enhancement permits on the basis of the Pay-to-Play policy; the public will not receive the message that using animals in entertainment furthers conservation; and, consequently, PETA will not have to divert resources to counter this message to prevent it from diluting the effectiveness of PETA's ongoing efforts to eliminate the use and abuse of animals in circuses and other entertainment. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

65.　　Defendants' unlawful issuance of enhancement permits further requires PETA to divert resources to additional efforts to prevent sport hunting and to public-education efforts in the U.S. to counteract the message that killing endangered species as a form of entertainment aids conservation.

66.　　If PETA prevails in this action, Defendants will no longer issue enhancement permits on the basis of the Pay-to-Play policy. This will discourage U.S.-based trophy hunters from killing endangered species by preventing them from bringing their trophies back to the United States. Since Defendants themselves admit that "United States citizens make up a disproportionately large share of foreign hunters who book trophy hunts," reducing the killing of endangered species by U.S.-based hunters would significantly reduce the incident of trophy hunts. PETA would have to divert substantially fewer resources to stopping trophy hunts and to countering the message that hunting endangered species furthers their conservation. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

67.     PETA's additional efforts and the resulting expenditures—which were not incurred due to the filing of this action—would not be necessary but for Defendants' unlawful decision to issue enhancement permits based on the Pay-to-Play policy.

## COUNT ONE

**Defendants' Issuance of Permits Pursuant to Its Pay-to-Play Policy Violates the ESA, the FWS Regulations, and the APA.**

68.     Plaintiff realleges paragraphs 1 through 67 as if fully stated herein.

69.     In or around 2011, Defendants began regularly issuing enhancement permits, in whole or in necessary part, on the basis of the Pay-to-Play policy.

70.     Defendants' pattern, practice, and/or policy of issuing enhancement permits, in whole or in necessary part, on the basis of the Pay-to-Play policy unlawfully fails to require applicants for enhancement permits to demonstrate that the activities for which they seek the permits will "enhance the propagation or survival of the affected species," 16 U.S.C. § 1539(a)(1)(A), as the Enhancement Requirement mandates.

71.     By unlawfully issuing enhancement permits on the basis of the Pay-to-Play policy—and, accordingly, without requiring applicants for enhancement permits to satisfy the Enhancement Requirement, Defendants are violating 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22.

72.     In doing so, Defendants are abusing their discretion, acting arbitrarily and capriciously, and acting contrary to law in excess of their statutory authority and without observation of procedure required by law, all in violation of the APA, 5 U.S.C. § 706(2).

73.     Defendants' issuance of enhancement permits in violation of the ESA, the FWS regulations, and the APA injured and is continuing to injure Plaintiff as detailed in paragraphs 50-67.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court issue an order:

(1) declaring that Defendants' Pay-to-Play policy is contrary to 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22, and that Defendants' issuance of enhancement permits based, in

-15-

Complaint for Declaratory and Injunctive Relief

whole or in necessary part, on the Pay-to-Play policy violates the ESA, the FWS regulations, and the APA;

(2) permanently enjoining Defendants from issuing enhancement permits based, in whole or in necessary part, on the Pay-to-Play policy;

(3) setting aside any enhancement permits currently in effect that were issued based, in whole or in necessary part, on the Pay-to-Play policy;

(4) awarding Plaintiff its costs and reasonable attorneys' fees; and

(5) awarding Plaintiff any other relief that is just and proper.

Date:   May 8, 2015

Respectfully submitted,

By: _____

*Jeffrey S. Kerr*
VA Bar No. 42122
Attorney for Plaintiff
PETA Foundation
1536 16th Street, NW
Washington, DC 20036
(202) 540-2171
(202) 540-2208
JeffK@Petaf.org

-16-
Complaint for Declaratory and Injunctive Relief